UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

MICHAEL RODRIGUEZ,                          :

                    Petitioner,              :

    -against-                               :

MARK L. BRADT, Superintendent of Elmira     :
Correctional Facility,

                             :

                    Respondent.              :

-------------------------------------------------------------X

09 Civ. 10285 (LTS) (DF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE LAURA TAYLOR SWAIN, U.S.D.J:**

     *Pro se* petitioner Michael Rodriguez ("Petitioner") seeks a writ of habeas corpus

pursuant to 28 U.S.C. § 2254, following his state conviction, upon his guilty plea, of one count

of Murder in the Second Degree, in violation of N.Y. Penal Law § 125.25. (*See* Petition Under

28 U.S.C. § 2254 For Writ of Habeas Corpus by a Person in State Custody, dated Nov. 12, 2009

(Dkt. 1) ("Petition" or "Pet.").) Petitioner is incarcerated at Elmira Correctional Facility in

Elmira, New York. (*See id.*)

     Petitioner claims that (1) his rights under the Fourth Amendment were violated by the

allegedly unlawful search of his mother's apartment and by his arrest; and (2) his guilty plea was

not knowing and voluntary because (a) his attorney put undue pressure on him to accept the plea

deal and he did not have adequate time to decide whether to plead guilty, and (b) he received

ineffective assistance of counsel when his attorney allegedly misrepresented that, if Petitioner

accepted the plea offer, Petitioner would be released on parole after serving 15 years. (*See*

Memorandum of Law in Support of Petition for a Writ of Habeas Corpus, dated Dec. 18, 2009

(Dkt. 2) ("Pet. Mem.").) Respondent William D. Brown ("Respondent"), the Superintendent of

Elmira Correctional Facility, argues that Petitioner's claims should be dismissed as not

cognizable, unexhausted, and/or without merit.  (*See* Answer and Appendix Opposing Petition

for a Writ of Habeas Corpus, dated May 26, 2010 (Dkt. 8) ("Resp. App."); Memorandum of Law

in Support of Answer and Appendix Opposing Petition for a Writ of Habeas Corpus, dated

May 26, 2010 (Dkt. 9) ("Resp. Mem.").)

     For the reasons set forth below, I recommend that the Petition be dismissed in its entirety.

## FACTUAL BACKGROUND

     The following facts are taken from evidence presented at a suppression hearing:  On

June 5, 2005, shortly after 8:45 p.m., Detective Eric Patino, who was working in the

10th Precinct detective squad office, received a phone call from Ricky Roldan ("Roldan").

(Supp. Tr., at 6-7.)[1]  According to Detective Patino, Roldan stated that he had just witnessed the

shooting of his friend, who was later identified as Johnny Rodriguez ("Johnny"), at 420 West

19th Street, in Manhattan, where Roldan lived.  (*Id*. at 7, 9.)  Detective Patino left the office and,

at approximately 9:15 p.m., arrived at the scene of the shooting.  (*Id*. at 8.)  He observed

Johnny's body inside an elevator, noted that Johnny had suffered gunshot wounds, and entered

Roldan's apartment to speak with him.  (*Id*. at 9.)  Roldan stated that Johnny had been shot,

while standing in the elevator, by a man known to Roldan as "Irks."  (*Id*.)

     That same evening, Roldan was taken to the 10th Precinct.  (*See id*. at 9-10, 87.)  During

an interview with Detective Carlos Rodriguez, Roldan described Irks as "a light skinned

Dominican," who was approximately 24 to 25 years old, 5'9" to 5'10" tall, and 140 to

---

[1] The transcripts of the proceedings before the state trial court are compiled, in chronological order, in one volume (Dkt. 7), including transcripts of a suppression hearing, conducted on May 8 and 9, 2006 ("Supp. Tr."); Petitioner's plea allocution, conducted on January 23, 2007 ("Plea Tr."); and Petitioner's sentencing, conducted on May 23, 2007 ("Sentencing Tr.").

150 pounds. (*Id.* at 89.) Detective Rodriguez collected a database of mug shots based on that information. (*Id.*) Roldan viewed approximately 469 photos and identified a photograph of Petitioner as the person Roldan knew as "Irks." (*Id.* at 89-90.)

Detective Rodriguez reviewed Petitioner's criminal history and found an address that Petitioner had provided at the time of his last arrest. (*Id.* at 90, 93.) At approximately 3:40 a.m. on June 6, 2005, Detective Rodriguez, along with eight other police officers, went to the address Petitioner had provided, 509 West 176th Street, Apartment 5D, in the Bronx. (*Id.*) The police officers positioned themselves in the building's fifth floor stairwell, in the hallway outside of the apartment, on the rooftop, and outside of the building. (*Id.* at 91-93.)

While in the stairwell of the apartment complex, Detective Rodriguez called the telephone number that was listed for Apartment 5D. (*Id.* at 93.) Eunice Gonzaque ("Gonzaque"), Petitioner's mother, answered the telephone. (*Id.* at 94.) Detective Rodriguez informed Gonzaque that he was a detective and asked if she knew whether her son was home. (*Id.* at 94.) Gonzaque responded that she did not know, but that she would check; a moment later, Gonzaque stated that Petitioner was not at home and asked whether something was "wrong." (*Id.*) According to Detective Rodriguez, he told Gonzaque that he was in the hallway and that, if she would come to the door and speak with him, he would explain what was happening (*id.* at 94-95); Gonzaque testified that he told her that, even if she did not open the door, he was going to enter (*id.* at 165).

A few minutes later, Gonzaque opened the door, about eight to 10 inches. (*Id.* at 95.) According to Detective Rodriguez, events then unfolded as follows: first, he identified himself and requested that Gonzaque allow him and at least two other police officers to enter the apartment to speak with her; second, after Gonzaque again indicated that Petitioner was not in

3

the apartment, Detective Rodriguez asked Gonzaque if the police officers could search the
apartment to confirm that Petitioner was not there; third, Gonzaque agreed, but continued to ask
what was happening; and, fourth, as Detective Rodriguez was explaining to Gonzaque that the
police officers were investigating a homicide and that they had reason to believe that Petitioner
might have been at the crime scene, the other police officers searched the apartment. (*Id.*
at 95-96.) Gonzaque, however, testified that, after she opened the door, Detective Rodriguez
pushed her aside and seven or eight police officers simply entered and searched the apartment.
(*Id.* at 166, 183-84.)

In any event, the police officers found Petitioner in the rear bedroom hiding inside a
closet. (*Id.* at 96, 109.) They then removed Petitioner from the apartment and transported him to
the 10th Precinct. (*Id.* at 97.) After waiving his *Marinda* rights, Petitioner provided oral,
written, and videotaped statements admitting that he had shot Johnny multiple times. (Id. at
17-31.)

Detective Rodriguez and another police officer remained at the apartment and continued
to question Gonzaque for approximately 30 minutes. (*Id.* at 103.) Detective Rodriguez
informed Gonzaque that he would be able to obtain a warrant to search the apartment further, but
that he needed to speak with the prosecutor assigned to the case to determine whether, instead,
Gonzaque could consent to the search. (*Id.* at 103, 168-69.) After Detective Rodriguez's
discussion with the prosecutor, Gonzaque wrote and signed a consent to search the apartment.
(*Id.* at 104.) According to Gonzaque, Detective Rodriguez told her what the statement needed to
say. (*Id.* at 169-70.) As a result of the search, the police seized certain property, including a
bullet-proof vest, a cell phone, personal clothing belonging to Petitioner, and documents, which

4

appeared to have been printed from a firearms website and contained information about a

.9 millimeter semi-automatic handgun, the same type of gun used to shoot Johnny. (*Id.* at 110.)

## PROCEDURAL HISTORY

### A.    Proceedings Before the Trial Court

On June 14, 2005, Petitioner was indicted for murder in the second degree. (*See* Resp.

App., Ex. A.) On August 11, 2005, Petitioner moved to suppress his statements to the police,

arguing that he had not understood his *Miranda* rights and that he had been "threatened, coerced

and intimidated by the police into making the statement[s]." (Resp. App., Ex. B., Mot. to

Suppress, ¶ 4) Petitioner also moved to suppress any physical evidence recovered from

Gonzaque's apartment, as he contended that Gonzaque had not voluntarily consented to any

search. (*Id.* ¶ 7) The prosecution opposed the motion (Resp. App., Ex. C), and, on May 8 and 9,

2005, the trial court held a *Mapp/Dunaway/Huntley* hearing.[2] On May 23, 2006, the trial court

denied Petitioner's motion in its entirety. (Resp. App., Ex. E.) In relevant part, the trial court

found that the police had probable cause to arrest Petitioner based on Roldan's identification of

Petitioner's mug shot; that Gonzaque had voluntarily consented to the search of her apartment;

and that Petitioner had conceded that his statements to the police were made voluntarily. (*Id.*)

On January 23, 2007, the date that Petitioner's trial was scheduled to commence,

Petitioner pleaded guilty to second-degree murder. (*See* Plea Tr., at 2.) During the plea

proceedings, Petitioner admitted that, on June 5, 2005, he had, acting with intent to cause the

---

[2] The trial court held the hearing pursuant to: (1) *Mapp v. Ohio*, 367 U.S. 643 (1961), to determine whether evidence was obtained in violation of Petitioner's Fourth Amendment right to be free from unreasonable search and seizure, as well as (2) *Dunaway v. New York*, 442 U.S. 200 (1979), and *People v. Huntley*, 15 N.Y.2d 72 (N.Y. 1965), to determine whether any statements made by Petitioner should be suppressed.

death of another, shot Johnny to death. (*Id*. at 4.) Petitioner confirmed that he had had sufficient

time to discuss his plea with his attorney and that nobody had threatened him or forced him to

plead guilty. (*Id*. at 3.) Petitioner also confirmed that he understood that he was waiving his

rights to trial by jury and to confront witnesses against him. (*Id*. at 3-4.)

 Petitioner acknowledged that the trial court had promised that it would sentence

Petitioner to 15 years to life, the minimum sentence imposed by law. (*Id*. at 4.) With respect to

parole, the court explained:

> THE COURT: [The court] would not oppose – [the court] would not [it]self raise
> any opposition to [Petitioner's] release by the Parole Authorities.
> That decision will be left up to them; do you understand?
>
> [PETITIONER]: Yes.

(*Id*. at 5.) Petitioner confirmed that no other promise had been made to him. (*Id*.)

 On January 30, 2007, Petitioner moved *pro se* to withdraw his plea. (Resp. App., Ex. F.)

The trial court assigned new counsel to represent Petitioner on the motion, and, on April 9, 2007,

Petitioner's new counsel filed supplemental papers in support of that motion. (Resp. App.,

Ex. G.) In that submission, Petitioner argued that he did not learn of the offered plea deal until

January 23, 2007, after completion of jury selection, and that his attorney then pressured him to

accept the offer immediately. (*Id*. ¶¶ 3-4.) Petitioner further contended that his attorney

promised him that, if he accepted the plea deal, then he would be released on parole as soon as

he had served his minimum term of 15 years. (*Id*.) Petitioner swore that, had he known that his

attorney could not make such a promise, he would not have pleaded guilty. (*Id*.) In opposition

to Petitioner's motion to withdraw his plea, the prosecution argued that the offer of 15 years to

life was made as early as April 5, 2006, and that, after the parties had discussed the offer before

the trial court on January 22, 2007, the court granted the request of Petitioner's counsel for an

adjournment to the following day to allow Petitioner additional time to consider the offer.

(Resp. App., Ex. H.)  The prosecution also informed the court that, if called to testify,

Petitioner's counsel was prepared to contradict Petitioner's contentions regarding their

conversations.  Moreover, according to the prosecution, Petitioner had in any event confirmed, at

his plea allocution, that he understood that the parole authorities would decide any parole date.

(*Id.* at 5.)

In a written order dated May 23, 2007, the trial court denied Petitioner's motion, finding

his allegations "simply not credible."  (Resp. App., Ex. I.)  The trial court held that Petitioner

had been "given time to discuss the case with his attorney and to consider the offer."  (*Id.*)  The

court further held that Petitioner's allegations regarding the representations of his attorney were

"insufficient to overcome his own earlier representations as to the voluntariness of his plea and

his clear-cut admission of guilt."  (*Id.*)  That same day, the trial court sentenced Petitioner to an

indeterminate prison term of 15 years to life.  (Sentencing Tr., at 5.)  The court confirmed that it

would not oppose parole.  (*Id.*)

### B.    Direct Appeal

In October 2007, Petitioner appealed his conviction to the New York Supreme Court,

Appellate Division, First Department.  (Resp. App., Ex. J.)  On appeal, Petitioner, through

counsel, argued (1) that the search of Gonzaque's apartment violated the Fourth Amendment

because the prosecution had failed to establish that Gonzaque had given her consent, and, as a

result, certain evidence seized in Gonzaque's apartment and Petitioner's subsequent statements

to the police should have been suppressed; and (2) that the trial court erred in denying his motion

to withdraw his guilty plea based on ineffective assistance of counsel.  (*Id.*)  Petitioner also filed

a *pro se* supplemental brief arguing that the police had coerced Gonzaque into consenting to the

search of the apartment and that the police officers had arrested him without probable cause.

(Resp. App., Ex. K.)

On June 5, 2008, the Appellate Division rejected all of Petitioner's claims. *See People v. Rodriguez*, 859 N.Y.S.2d 428 (N.Y. App. Div. 2008). The court found that the prosecution had met its burden of establishing a valid consent to search. *Id.* at 429. As to Petitioner's guilty plea, the Appellate Division found that:

> During his plea allocution, [Petitioner] acknowledged that he understood the terms of his plea, understood that any decision on parole would be left up to the parole authorities, and acknowledged that, aside from certain promises enumerated on the record, no other promise had induced his plea. As a result, [Petitioner] was not entitled to withdraw his plea on the basis of his uncorroborated assertion that his prior attorney had misinformed him he would actually be granted parole upon the expiration of his minimum term.

*Id.* Petitioner sought leave to appeal to the New York Court of Appeals on the grounds raised in his counseled and *pro se* briefs. (Pet., Ex. 13.) On August 19, 2008, leave to appeal was denied. *See People v. Rodriguez*, 894 N.E.2d 663 (N.Y. 2008).

**C.    The Habeas Petition**

Petitioner filed his federal habeas petition, together with a memorandum of law, on November 12, 2009.[3] (*See* Pet.) On May 26, 2010, Respondent opposed the Petition by filing an Answer and Appendix in Opposition to Petition for Writ of Habeas Corpus (Dkt. 8), together with a memorandum of law, exhibits, and the transcripts of Petitioner's trial court proceedings.

---

[3] Although the Court's docket reflects a filing date of December 18, 2009 (*see* Dkt. 1), a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the court, *see Houston v. Lack*, 487 U.S. 266, 270 (1988), and, in the absence of evidence to the contrary, this Court will deem the Petition to have been filed on November 12, 2009, the date on which Petitioner apparently signed it, *see, e.g., Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 2000).

Following an extension, Petitioner filed a reply on July 30, 2010.  (Petitioner's Reply to Answer

in Opposition to a Writ of Habeas Corpus, dated July 30, 2010 (Dkt. 11) ("Pet. Reply").)

## DISCUSSION

### I.    APPLICABLE LEGAL STANDARDS

#### A.    Statute of Limitations

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a habeas petition

must be filed within a one-year limitations period beginning on the latest of four dates, most

commonly "the date on which the judgment became final by the conclusion of direct review or

the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A) (2000); *see also*

*Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001) (judgment becomes "final" for purposes of

Section 2244 upon "the completion of direct appellate review in the state court system and either

the completion of certiorari proceedings in the United States Supreme Court, or – if the prisoner

elects not to file a petition for certiorari – [the expiration of] the time to seek direct review via

certiorari") (internal citations omitted).[4]

In this case, the New York Court of Appeals denied Petitioner leave to appeal on

August 19, 2008, *Rodriguez*, 894 N.E.2d 663, and his appellate process was complete on

November 17, 2008 (allowing for the 90-day period to seek certiorari review).  As this Court

deems Petitioner's habeas petition to have been filed on November 12, 2009 (*see supra* note 4),

---

[4] The limitations period may alternatively begin to run on:  (1) "the date on which the
impediment to filing an application created by State action in violation of the Constitution or
laws of the United States is removed, if the applicant was prevented from filing by such State
action," 28 U.S.C. § 2244(d)(1)(B); (2) "the date on which the constitutional right asserted was
initially recognized by the Supreme Court, if the right has been newly recognized by the
Supreme Court and made retroactively applicable to cases on collateral review," *id.*
§ 2244(d)(1)(C); or (3) "the date on which the factual predicate of the claim or claims presented
could have been discovered through the exercise of due diligence," *id.* § 2244(d)(1)(D).

within one year of the completion of his direct appeal, the Petition should be considered timely. *See* 28 U.S.C. § 2244(d)(2)(A).

**B.     Exhaustion**

A federal court may not consider a petition for a writ of habeas corpus unless the petitioner has exhausted all state judicial remedies.  28 U.S.C. § 2254(b)(1)(A); *see also Doresy v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997); *Picard v. Connor*, 404 U.S. 270, 275 (1971). To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the "'opportunity to pass upon and correct' alleged violations of . . . prisoners' federal rights." *Id.* at 275 (quoting *Wilwording v. Swenson*, 404 U.S. 249, 250 (1971)).  A petitioner may accomplish this in several ways, including citation to relevant provisions of the federal Constitution in his appellate brief.  *See Davis v. Strack*, 270 F.3d 111, 122-23 (2d Cir. 2001).

After apprising state courts of the federal nature of his claims, the petitioner must also, for purposes of the exhaustion requirement, present those claims to "the highest court of the pertinent state."  *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) (citation omitted).  To accomplish this in New York, petitioners must seek "further review of [their] conviction by applying to the Court of Appeals for a certificate granting leave to appeal," which may be achieved with a letter submission, and "submit to the Court of Appeals briefs and other documents from the lower courts."  *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005).  A court will deem the exhaustion requirement satisfied where the "fair import" of  the total application suggests a request for review of the constitutional claims raised in those submissions.  *Id.* at 75-77.

10

As noted above, Petitioner claims in this habeas proceeding that (1) law enforcement violated his Fourth Amendment rights; and (2) his guilty plea was not knowing and voluntary because of (a) undue pressure from Petitioner's attorney to accept the plea deal and the inadequacy of time for Petitioner to make a decision, and (b) misrepresentations by Petitioner's attorney that the plea agreement only required Petitioner to serve a 15-year sentence. Petitioner fully exhausted his Fourth Amendment claims, as well as his claim challenging the validity of his plea based on an alleged misrepresentation by his counsel regarding parole eligibility, as he raised both of these claims on direct appeal to the Appellate Division (*see* Resp. App., Exs. J, K), and then sought leave to appeal the denial of these claims to the New York Court of Appeals (*see* Pet., Ex. 23). Petitioner, however, has not fully exhausted his claim challenging the validity of his plea based on alleged undue pressure and inadequate time. Petitioner never argued this claim on appeal; he only raised this claim before the trial court (*see* Resp. App., Ex. G), and abandoned it thereafter. Thus, the Petition is a "mixed petition," *i.e.*, one that contains both exhausted and unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 271 (2005).

When ruling on a mixed petition, the Court may consider the option of permitting Petitioner to return to state court to exhaust any unexhausted claims, *see id.* at 277-78, but, if the unexhausted claims are plainly without merit, the Court may alternatively choose to deny the claims on the merits, *see* 28 U.S.C. § 2254(b)(2). Here, I recommend that the Court review all of Petitioner's claims, as each claim is subject to dismissal on the merits, as explained below.

11

C.   **Standard of Review**

With respect to Petitioner's habeas application, AEDPA, the relevant provision of which

is codified as 28 U.S.C. § 2254(d), requires this Court to accord deference to state court

decisions.  Section 2254(d) provides, in relevant part, that a court may grant a writ of habeas

corpus on a claim that has been previously adjudicated on the merits by a state court only if the

state adjudication:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d)(1), (2); *see also Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001)

(noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims,

with res judicata effect, that is based on the substance of the claim advanced, rather than on a

procedural, or other, ground").

Under Section 2254(d)(1), a state court decision is "contrary to" clearly established

federal law where the state court either applies a rule that "contradicts the governing law" set

forth in Supreme Court precedent or "confronts a set of facts that are materially indistinguishable

from a [Supreme Court] decision" and arrives at a different result.  *Williams v. Taylor*, 529 U.S.

362, 405-06 (2000).[5]  An "unreasonable application" of clearly established federal law pursuant

---

[5] The Supreme Court has emphasized that "clearly established [f]ederal law" refers only
to the "'holdings, as opposed to the dicta, [of the Supreme Court's] decisions as of the time of
the relevant state-court decision.'"  *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting
*Williams*, 529 U.S. at 412); *see also Rodriguez v. Miller*, 537 F.3d 102, 107 (2d Cir. 2007)
("*Musladin* admonishes courts to read the Supreme Court's holdings narrowly and to disregard
dicta for habeas purposes.").  Thus, a principle of constitutional law "grounded solely in the
holdings of the various courts of appeals or even in the dicta of the Supreme Court" cannot
provide the basis for habeas relief.  *Id.* at 106-07 (citing *Musladin*, 549 U.S. at 75-76).

12

to this provision occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 73-76 (2003). The state court's decision, however, "must have been more than incorrect or erroneous" – rather, "[t]he state court's application must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams*, 529 U.S. at 409). In other words, the state court's ruling must have been "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).

Under Section 2254(d)(2), the language "unreasonable determination of the facts" imposes a highly deferential standard with respect to the factual findings of the state court. *See Felkner v. Jackson*, 131 S.Ct. 1305, 1307 (2011) (noting that AEDPA requires that state court rulings receive the benefit of the doubt). Additionally, "a state court's determination of a factual issue is presumed to be correct, and the petitioner bears the burden of rebutting the presumption by clear and convincing evidence." *Richard S. v. Carpinello*, 589 F.3d 75, 80-81(2d Cir. 2009) (citing 28 U.S.C. § 2254(e)(1)); *see also Bierenbaum v. Graham*, 607 F.3d 36, 48 (2d Cir. 2010) (stating that, pursuant to 28 U.S.C. § 2254(e)(1), "[a] state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence).

Where this Court reaches the merits of a claim that has not been decided by the state court on substantive grounds, the pre-AEDPA *de novo* standard of review applies. *See Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003).

13

## II.   **PETITIONER'S CLAIMS**

### A.   **Fourth Amendment Claims**

Petitioner asserts that his Fourth Amendment rights were violated by the search of

Gonzaque's apartment and by his arrest. (*See* Pet., Grounds 1 and 2.) These claims are not

cognizable on federal habeas review.

In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court established that, "where the

state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a

state prisoner may not be granted federal habeas corpus relief on the ground that evidence

obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494; *see also*

*Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992). Thus, a federal court "ha[s] no authority to

review the state record and grant the writ simply because [it] disagree[s] with the result reached

by the state courts" on a Fourth Amendment issue. *Gates v. Henderson*, 568 F.2d 830, 840

(2d Cir. 1977); *see also Torres v. Irvin*, 33 F. Supp. 2d 257, 264 (S.D.N.Y. 1998) (stating that

"[a] petition for a writ of habeas corpus must be dismissed where it seeks simply to relitigate a

Fourth Amendment claim"). Indeed, a federal court may only review such a claim where "the

state has provided no corrective procedures at all" or where the state has provided a corrective

mechanism, but the defendant is precluded from using that mechanism "because of an

unconscionable breakdown in the underlying process." *Capellan*, 975 F.2d at 70 (citing *Gates*,

568 F.2d at 840); *Torres*, 33 F. Supp. 2d at 264. "[A] disruption or obstruction of a state

proceeding" or an instance of serious judicial or prosecutorial misconduct may constitute such a

breakdown in process. *Capellan*, 975 F.2d at 70 (citations omitted); *see also Cappiello v. Hoke*,

698 F. Supp. 1042, 1050 (E.D.N.Y. 1988) (explaining that an "unconscionable breakdown in the

state's process must be one that calls into serious question whether a conviction is obtained

14

pursuant to those fundamental notions of due process that are at the heart of a civilized society," such as the bribing of a state court judge, the government's knowing use of perjured testimony, and the use of torture to extract a guilty plea), *aff'd*, 852 F.2d 59 (2d Cir. 1988) (per curiam).

Here, Petitioner does not dispute that he had the opportunity to litigate his Fourth Amendment claims in state proceedings, both before the trial court and on direct appeal. Nor does Petitioner contend that the state corrective process was marred by obstruction or official misconduct. Rather, he argues that there was an unconscionable breakdown in process because, in their review of his Fourth Amendment claims, the trial court and the Appellate Division failed to consider "key aspects of the record," which, according to Petitioner, would have led to a different result. (Pet. Mem., at 44; *see* Pet. Reply, at 3.) Yet, "the focus of the inquiry as to whether there has been an 'unconscionable breakdown' in the state corrective process is on 'the existence and application of the corrective procedures themselves' rather than on the 'outcome resulting from the application of adequate state court corrective procedures.'" *Singh v. Miller*, 104 F. App'x 770, 772 (2d Cir. 2004) (quoting *Capellan*, 975 F.2d at 71). In this case, Petitioner was afforded a suppression hearing, the opportunity to file a post-conviction motion to the trial court, and a full opportunity to appeal. Moreover, based on a review of the proceedings before the trial court and on direct appeal, it appears that the state courts conducted "a reasoned method of inquiry into relevant questions of fact and law." *Capellan*, 975 F.2d at 71 (citation omitted).

As Petitioner has not demonstrated that the state failed to provide a corrective procedure or that an "unconscionable breakdown" occurred in that corrective process, his Fourth Amendment claims are not reviewable by this Court. Accordingly, I recommend that these claims be dismissed.

15

**B.**    **Petitioner's Guilty Plea**

Petitioner's remaining claims relate to his guilty plea and the effectiveness of his attorney in counseling him in connection with the plea.  In particular, as set forth above, Petitioner claims that his guilty plea was not knowing and voluntary because (1) his attorney put undue pressure on him to accept the plea deal, and he did not have adequate time to decide whether to plead guilty; and (2) he received ineffective assistance of counsel when his attorney allegedly misrepresented that under the plea agreement, Petitioner would be released on parole after serving minimum term of 15 years.  (*See* Pet. Mem., at 38-41.)

A guilty plea must be both knowing and voluntary in order to be valid.  *Parke v. Raley*, 506 U.S. 20, 28-29 (1992) (stating that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant") (internal quotation marks omitted) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)).  In determining whether a particular guilty plea was made intelligently, a court must assess whether the defendant was in control of his or her "mental faculties" during the plea, "was advised by competent counsel [and] . . . made aware of the nature of the charge against [him or her]," and was "fully aware of the direct consequences" of the plea.  *Brady v. United States*, 397 U.S. 742, 755-56 (1970).  In determining whether a guilty plea was made voluntarily, a court must consider "all of the relevant circumstances surrounding" the plea, including whether it was made free of threats, harassment, misrepresentation or improper promises, such as a bribe.  *Id. at* 749, 755.  This Court addresses each of Petitioner's challenges to the validity of his plea in turn.

**1.**    **Alleged Undue Pressure and Inadequate Time**

The first of Petitioner's claims relating to his plea – that he was unduly pressured to plead guilty and that he lacked sufficient time to consider the plea offer – is unexhausted, but

16

should nevertheless be dismissed on the merits. (*See supra* at Part I(B).) The standard of review dictated by AEDPA requires that this Court accord substantial deference to state court determinations. *See* 28 U.S.C. § 2254(d). Where, however, this Court decides to consider the merits of an unexhausted claim, an inadequate basis exists for deference to the state court, and thus the Court considers such a claim *de novo*. *See Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003).

    At his plea proceedings, Petitioner confirmed that he had "had enough time to discuss [his] decision" to plead guilty with counsel. (Plea Tr., at 3.)[6] Petitioner also confirmed that no one had "threatened [him] or forced [him] to plead guilty." (*Id.*) "A trial court may fairly rely upon a [petitioner's] sworn statements made in open court." *Salerno v. Berbary*, 389 F. Supp. 2d 480, 484-85 (W.D.N.Y. 2005) (rejecting a petitioner's challenge to validity of guilty plea where his allegations in the habeas proceeding were contradicted by his sworn statements at the plea allocution). Given his statements during the plea proceedings, Petitioner cannot succeed on his claim that his attorney improperly pressured him to accept the plea offer and that Petitioner did not have sufficient time to consider the offer. Accordingly, I recommend that this claim be dismissed.

---

[6] As noted above, there is a factual dispute regarding the sequence of events leading up to Petitioner's guilty plea. In an affidavit in support of his motion to withdraw his plea, Petitioner claimed that he did not learn of the plea offer until the morning of January 23, 2007, after the jury had been selected. (Resp. App., Ex. G.) In an affirmation in opposition to that motion, however, the prosecution asserted that this offer was made more than nine months earlier, on April 5, 2006, and that, on January 22, 2007, the trial court granted a request by Petitioner that the trial be adjourned for a day to allow Petitioner additional time to consider the offer. (Resp. App., Ex. H.) The Court need not resolve this factual dispute, in light of Petitioner's representations at his plea allocution.

### 2.   Alleged Misrepresentation by Counsel

As Petitioner has fully exhausted the second of his plea-related claims – that his guilty plea was not knowing and voluntary (*see supra* at Part I(B)), the Court addresses this claim under the standard of review set forth in AEDPA.[7]  *See* 28 U.S.C. § 2254(d).

A petitioner who pleads guilty on the advice of counsel, may attack the voluntary and knowing nature of the plea by demonstrating that such advice constituted ineffective assistance of counsel under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Hill v. Lockhart*, 474 U.S. 52, 56-59 (1985) (holding that the two-part *Strickland* test "applies to challenges to guilty pleas based on ineffective assistance of counsel").  Under *Strickland*, the petitioner must first show that counsel's performance was deficient; that is, it fell below an "objective standard of reasonableness," measured under "prevailing professional norms." *Strickland*, 466 U.S. at 688.  Second, the petitioner must affirmatively demonstrate prejudice by showing that "there is a reasonable probability that, but for counsel's [error], the result of the proceeding would have been different." *Id.* at 694; *accord Hill*, 474 U.S. at 56-59.

As to the second prong of *Strickland*, it is not enough that counsel's error "had some conceivable effect on the outcome of the proceeding[,] [as] virtually every act or omission of

---

[7] Respondent suggests that the Petition should be read to raise two separate claims based on the alleged misrepresentation of counsel (first, an exhausted claim that Petitioner's plea was invalid because he relied on the misrepresentation, and, second, an unexhausted ineffective assistance of counsel claim).  (*See* Resp. Mem., at 32.)  The Court, however, is persuaded that, as in *Hill*, Petitioner seeks to raise one composite claim challenging the validity of his plea based on his reliance on his attorney's advice regarding parole eligibility, which Petitioner contends constituted ineffective assistance of counsel.  On his direct appeal, Petitioner exhausted this composite claim, framed in this way.  (*See* Resp. App., Ex. J, at 21 (arguing that "the court erroneously denied [Petitioner's] motion to withdraw his guilty plea based on ineffective assistance of counsel where the record fully supported [Petitioner's] allegation that his attorney made an affirmative misrepresentation that had a direct impact on [Petitioner's] decision to plead guilty" and citing, *inter alia*, the Sixth Amendment and *Strickland*).)

18

counsel would meet that test." *Strickland*, 466 U.S. at 693 (citation omitted).  Rather, a "reasonable probability" that the result of the proceeding would have been different means "a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  In the context of a guilty plea, a petitioner must satisfy this prejudice requirement of *Strickland* by demonstrating that counsel's ineffective performance "affected the outcome of the plea process." *Hill*, 474 U.S. at 59.  That is, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, [the petitioner] would not have pleaded guilty and would have insisted on going to trial." *Id.*

The Court may reject an ineffective assistance of counsel claim for failure to satisfy either prong of the *Strickland* standard, without reaching the other.  *Strickland*, 466 U.S. at 697 (stating that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed").

Here, even assuming that Petitioner's attorney misrepresented that the plea agreement would, with certainty, allow for Petitioner's release after he had served 15 years in prison, Petitioner cannot demonstrate that he relied on that misrepresentation in pleading guilty.  In particular, as set forth above, the trial judge explicitly informed Petitioner, during the plea proceedings, that any parole determination would be made by the parole authorities.  (Plea Tr., at 5.)  At the time of his plea, Petitioner confirmed that he understood this.  (*Id.*)  Based on this record, Petitioner cannot show that, but for the alleged misrepresentation by his attorney, he would not have proceeded with his guilty plea, and, thus, he cannot demonstrate prejudice arising from any alleged ineffective assistance of counsel.  *See Hill*, 474 U.S. at 59.  Moreover, Petitioner's core assertion that his attorney promised him parole after 15 years contradicts Petitioner's own sworn statement in which, during his plea allocution, he confirmed that he had

19

received no promises other than those stated on the record. (*See* Plea Tr., at 5; *see also United States v. Hernandez*, 242 F.3d 110, 114 (2d Cir. 2001) (rejecting an ineffective assistance claim "on the merits because [the defendant's] factual assertions regarding his counsel's alleged ineffectiveness simply contradict his sworn statements at the plea allocution").)

As the Appellate Division's rejection of this claim was neither contrary to, nor an unreasonably application of, established federal law, *see* 28 U.S.C. § 2254(d), I recommend that this claim be dismissed as well.

## CONCLUSION

For all of the foregoing reasons, I recommend that Petitioner's petition for a writ of habeas corpus be dismissed in its entirety. Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain, United States Courthouse, 500 Pearl Street, Room 755, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Swain. FAILURE TO FILE OBJECTIONS WITHIN 14 DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992);

*Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983). If Petitioner does not have access to cases cited herein that are reported on Westlaw, he may request copies from Respondents' counsel. *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the pro se litigant with copies of such unpublished cases and other authorities as are cited in a decision of the Court and were not previously cited by any party.").

Dated: New York, New York
      September 13, 2011

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Hon. Laura Taylor Swain, U.S.D.J.

Mr. Michael Rodriguez
07-A-3678
Elmira Correctional Facility
1879 Davis Street
P.O. Box 500
Elmira, NY 14902

Charlotte Eugenie Fishman, Esq.
New York County District Attorney's Office
1 Hogan Place
New York, NY 10013

21